**Louise LAMPHERE, on behalf of herself and all others similarly situated**

v.

**BROWN UNIVERSITY IN PROVIDENCE IN THE STATE OF RHODE ISLAND AND PROVIDENCE PLANTATIONS, et al.**

Civ. A. No. 75–0140 P.

United States District Court,
D. Rhode Island.

Feb. 9, 1989.

Milton Stanzler, Providence, R.I., for plaintiff.

Beverly Ledbetter, Legal Counsel, Brown University, Peter J. McGinn, Tillinghast, Collins & Graham, Providence, R.I., for defendant.

## OPINION AND ORDER

PETTINE, Senior District Judge.

The parties to the Consent Decree entered in this case in 1977 have filed cross-motions requesting that the Court take certain actions with regard to the Decree. The plaintiff class, women faculty members of Brown University, has moved the Court to modify the Decree by setting a goal for tenuring women faculty to be attained by 1991, calculated in accordance with certain projections. The defendant, Brown University, has moved for a determination as to whether the Consent Decree has terminated. In the alternative, the University has requested that, if the Court finds that the Decree has not terminated, it set a termination date for said Decree and modify certain aspects for its future operation.

## I. BACKGROUND

The named plaintiff filed her complaint on May 10, 1975, and her amended complaint on February 11, 1976, alleging that the University and certain officers and individuals were engaged in employment discrimination based on sex in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. Section 2000e et seq., as amended. The defendants denied the allegations. The matter was certified as a class action on July 21, 1976.

### A. *The Consent Decree*

A consent decree was issued, with the consent of the defendants, on September 12, 1977. The Decree permanently enjoined the University from "discriminating against women on the basis of sex with respect to all terms and conditions of faculty employment, including recruitment, hiring, promotion, contract renewal and tenure." Lamphere Consent Decree, Section 1.

Beyond this general prohibition, the Decree further ordered the University to take steps to ensure the University's success in achieving the Decree's broad purpose. Among these was the establishment of precise numerical objectives for appointing women faculty or promoting women to tenure:

2. The University is ordered to take the following affirmative steps:

(A) Develop and maintain goals and timetables in accordance with Exhibit A.

(B) Until the goals as set forth in Exhibit A are attained and full utilization of women faculty based on statistical availability as defined in Exhibit A is reached, apply affirmative action on behalf of women faculty in hiring, contract renewal, promotion, and tenure by giving preference to a female candidate of equal qualifications over non-minority males....

Consent Decree, Section 2. Exhibit A established goals and timetables "describing the number of women who it is expected will be members of the tenured and nontenured regular faculty at Defendant Brown University in the future." Consent Decree, Exhibit A, Section 1. The goals represented "an attempt to attain a faculty composition by sex which is based on full utilization of qualified women, as measured by their availability." Consent Decree, Exhibit A, Section 1. The term "full utilization" was defined in this way:

Full utilization in any given year should be the expected composition by sex of tenured and nontenured regular faculty positions in that year as measured by availability of men and women recipients of PhD degrees in the various disciplines and subdisciplines represented by departments or programs at the University.

Consent Decree, Exhibit A, Section 4. The Decree also carefully set out the appropriate national availability pools for tenured and nontenured women, and the sources of data relied on to determine the proportion of women in the availability pools. The Decree then derived from the availability data the following goals and timetables, delineated by areas of related academic disciplines:

| Tenured Women: | 1979 | 1983 | 1987 |
|---|---|---|---|
| Humanities | 13.5 | 22.3 | 30.7 |
| Social Sciences | 3.3 | 7.1 | 10.7 |
| Physical Sciences | 3.3 | 4.6 | 6.0 |
| Life Sciences | 5.3 | 8.7 | 9.6 |
| Total | 25.4 | 42.7 | 57.0 |

| Nontenured Women: | 1979 | 1983 | 1987 |
|---|---|---|---|
| Humanities | 24.2 | 23.2 | 24.7 |
| Social Sciences | 8.4 | 7.7 | 7.5 |
| Physical Sciences | 2.2 | 2.6 | 2.0 |
| Life Sciences | 7.9 | 6.2 | 6.5 |
| Total | 42.7 | 39.7 | 40.7 |

Consent Decree, Exhibit A, Section 6a. The Decree stated that, "In calculating these goals and timetables, it has been assumed that the attrition rate of male tenured faculty for reasons other than retirement will continue to be as great as it has been in previous years. It has also been assumed that the attrition rate of female tenured faculty will be zero."

It must be noted that the goals and timetables were not intended as ends in themselves, but were set "to provide a measure of the extent to which the affirmative action procedures elaborated elsewhere [in the Decree] are operating effectively." Consent Decree, Exhibit A, Section 2. An important premise of the Decree is that, "The effectiveness of affirmative action procedures can be measured in part by the time within which they succeed in achieving and maintaining a situation where the proportion of women in tenured and untenured positions on the Brown faculty reflects the proportion of women in the appropriate pool of available PhD's." Consent Decree, Exhibit A, Section 3.

A second step ordered by the Decree was the establishment of an Affirmative Action Monitoring Committee ("AAMC"), which was charged with the implementation and enforcement of the Decree. Consent Decree, Section 2(L). The AAMC was to have five members. Of the original committee, two members were to be selected by the plaintiff and two members were to be elected by the voting faculty of the University; these four members were to select a fifth member from the tenured faculty. Committee members were to serve a term of three years. At the end of the first three-year term, a panel of three tenured faculty persons (nominated earlier by the plaintiff) was to select the successors to the two Committee members selected by the plaintiff. This same 3–person panel was also to elect a panel to succeed it. All successor panels were to proceed likewise—first selecting the two persons who would serve as Committee members and then choosing a new 3–person panel. The remaining three Committee members were to continue to be elected in the same manner as their predecessors.

Among its implementation and enforcement duties, the AAMC was charged specifically with ensuring the updating of the goals and timetables established in Exhibit A. Consent Decree, Exhibit A, Section 11.

The Decree anticipated that such updating might be necessary because of the possibility of changes in the underlying variables used to calculate the goals and timetables.

First, the number of faculty positions could change. The goals were set in part on the basis of a staffing plan indicating the current and anticipated number of faculty positions for tenured and nontenured regular faculty at the University. Because the plan was subject to modification, the University was ordered to file a staffing plan, as modified, with the AAMC by July 1 of each year. If the modified staffing plan provided for an increase in the number of faculty positions, above that which was originally projected, the goals and timetables were to be adjusted to reflect such increase. Consent Decree, Exhibit A, Section 7.

Second, the availability of women PhD recipients could change. The University was ordered to supply the Committee with a copy of any relevant data sources concerning PhD recipients. The Decree anticipated that the goals and timetables it set forth would be "updated, on a bi-annual basis beginning with the academic year 1981–82, in accordance with the principles for establishing goals and timetables [set forth in the Decree] as well as in accordance with the new data." Consent Decree, Exhibit A, Section 8.

The Decree suggested that the parties try to reach agreement on the updated goals and timetables, but it provided for the situation where they did not agree: "In the event that the parties cannot agree upon updated goals and timetables ..., updated goals and timetables will be determined by the Monitoring Committee, or the Court, in accordance with the principles established by this Exhibit [Exhibit A of the Decree]." Consent Decree, Exhibit A, Section 11.

Certain procedural matters were also treated in the Decree. To ensure compliance, the Decree empowered the AAMC to hear any complaints as to violations and to review University decisions on hiring, contract renewal, promotion and tenure. Consent Decree, Section 2(L). The Decree further provided for the appeal of Committee decisions to the Court:

In the event that any woman is dissatisfied with a decision of the Committee which directly affects her, she may seek de novo consideration by appropriate motion to the Court. Likewise, de novo judicial consideration of Committee decisions with respect to implementation or compliance with the provisions of this Decree may be initiated by any class member. The University may also seek de novo consideration of any decision of the Committee by appropriate motion to the Court.

Consent Decree Section 2(L). The Decree specified the burden of proof applicable to both the AAMC reviews and the de novo consideration by the Court. In both settings, the burden of proof differed from that typically used in Title VII cases. The Decree required the employer (here, the University) to prove by clear and convincing evidence that it had not discriminated on the basis of sex. Consent Decree, Section 2(F)(1)–(4).

### B. *Conflict Over the Consent Decree*

The instant action arises out of a recent revision, agreed to by the University and the AAMC, in the goals and timetables spelled out in Exhibit A for 1987.

According to testimony, the AAMC and the University agreed that the goal for tenured women in 1987 needed to be revised for several reasons, among them attrition of tenured women faculty, changes in the number of tenured positions, and changes in the total number of faculty. (Testimony of M. Glicksman, Transcript of Hearing, October 18, 1988 (hereafter "Tr."), p. 28.) In March 1987, the Committee accepted the University's proposed revision of the goal from 57 to 50 tenured women for 1987. (Letter to the Court from Karen Newman, Chair, AAMC, March 16, 1987, appended to Motion of Brown University to Set a Termination Date and/or Modify the Lamphere Consent Decree). The plaintiff class did not directly participate in or agree to this revision. (Statement of plaintiffs' counsel, Tr. 27; Plaintiffs' Reply

to Defendant['s] Memorandum to Modify Lamphere Consent Decree, p. 3.)

At some later time, the University informed the AAMC that it did not intend to update goals beyond 1987.[1] Responding to the language of Exhibit A, which charged the Committee or the Court with determining updated goals and timetables in the event that the parties could not agree to do so, the AAMC took action. By applying the principles articulated in Exhibit A, Sections 3–6, the Committee established a range for the updated goal of an additional 11 to 16 women to be promoted or appointed to tenured positions by 1991. Further scrutiny of this range led the AAMC to decide, on the basis of such factors as median age of promotion to tenure and the increasing proportion of women holding PhDs in the age groups being tenured, that the most appropriate goal for 1991 was 15 additional appointments to tenure. Report of the AAMC, "Revision and Updating of Goals and Timetables for Tenured Women Faculty for 1991".

In the aftermath of these events, the plaintiff class moved this Court to modify the Decree in accordance with the AAMC's projections. Defendants in turn moved for the termination of the Decree or, in the alternative, its modification pending a requested termination date of June 30, 1990.

## II. THE ISSUES

### A. *Termination or Continuation of the Consent Decree*

The principal cluster of issues broached by the motions presently before this Court is whether the Consent Decree has dissolved on its own terms; whether, if it has not naturally expired, it should nevertheless be terminated due to changed circum-stances; or whether, if still in full force and effect, it should be modified to reflect present realities and if so how.

The plaintiffs' position, spelled out in their May 31, 1988 Motion to Modify Consent Decree, is that the goal of tenuring 57.0 women faculty by 1987 was not met by the University, that "full utilization of women faculty based on statistical availability" has thus not yet been achieved, and consequently that the goals and timetables established in Exhibit A must be revised and updated in order to guide the University's continued efforts to attain the ultimate goal contemplated by the Decree of "full utilization of women faculty." In keeping with this analysis, plaintiffs urge the Court to adopt the report issued by the AAMC establishing the goal of 15 appointments of women to tenure by 1991.

Defendant Brown University counters plaintiffs' motion to update the goals and timetables with a Motion to Set a Termination Date and/or Modify the Lamphere Consent Decree, filed with this Court July 1, 1988. Defendant's basic position is that, based on the University's strong affirmative action record in the years since the Consent Decree was adopted, the time has come for this Court to determine that the University has substantially complied with the terms of the Decree, which does not establish goals and timetables beyond 1987, and thus that the Decree has terminated. Defendants cite in support of this proposition the following facts: that in March 1987, after receiving information from the University about attrition of women from the tenured faculty and changes in the number of tenured positions in the years since 1978, the AAMC adopted a "revised goal" of 50 tenured women faculty by June 30, 1987; [2,3]; that the University successful-

---

1. In fact, the University's Provost has admitted that Brown rarely complied with the Decree's order to annually file revised staffing plans and updated availability indices, thereby thwarting the Decree's further order that the goals and timetables be updated bi-annually. (Testimony of M. Glicksman, Tr. 47, 49–50; *see also* Testimony of H. Ward, Tr. 81.)

2. The "revised goals" for 1987 for tenured women, proposed by the University and agreed to by the AAMC, were as follows:

| | |
|---|---|
| Humanities | 26.7 |
| Social Sciences | 8.0 |
| Physical Sciences | 6.0 |
| Life Sciences | 9.0 |
| Total | 49.7 |

Memorandum in Support of Brown University's Motion, July 1988, p. 3.

3. The AAMC has stated the overall "revised goal" as 50, apparently by rounding 49.7. Letter to the Court from Karen Newman, Chair,

ly met this "revised goal"; that, in addition, the University had greatly exceeded the goal of 40.7 non-tenured women faculty by June 30, 1987, having appointed 58 women to non-tenured positions by that time; that, on an interdisciplinary basis, the University has fully achieved the original goals and timetables for nontenured women by June 30, 1987 and had achieved the "revised goal" for tenured women in three of four disciplines, excepting only the Humanities; that the University had achieved the "revised goal" for the Humanities within one year of the original timetable, that is by June 30, 1988; and that, when compared to comparable institutions, Brown now "stands at the top relative to non-tenured women appointments and third of eleven for tenured women faculty". *See generally* Memoranda in Support of Brown University's Motion to Set a Termination Data and/or Modify the Lamphere Consent Decree, July 1988 and December 1988. In the alternative, defendant argues, the Court should determine that the Consent Decree should continue as to tenured women only to a date not later than June 30, 1990, three years beyond the last expressed date in the current goals and timetables and the last year mentioned in any context in the Decree, and should then terminate, assuming that the University has substantially complied by that date with whatever updated goals and timetables are adopted by the Court.

1. *The Law Governing Termination or Modification of the Consent Decree*

There is no disagreement between the parties as to the law governing termination or modification of a consent decree like the one currently before this Court. As the Supreme Court made clear in *United States v. Swift & Co.*, 286 U.S. 106, 52 S.Ct. 460, 76 L.Ed. 999 (1932), a trial court may, in the exercise of its equity jurisdiction, modify a consent decree only upon a showing that "changed circumstances" have transformed the decree into an instrument of oppression:

AAMC, March 16, 1987, appended to Motion of Brown University to Set a Termination Date

There is need to keep in mind steadily the limits of inquiry proper to the case before us. We are not framing a decree. We are asking ourselves whether anything has happened that will justify us now in changing a decree.... The inquiry for us is whether the changes are so important that dangers, once substantial, have become attenuated to a shadow.... Nothing less than a clear showing of grievous wrong evoked by new and unforeseen conditions should lead us to change what was decreed after years of litigation with the consent of all concerned.

*Swift & Co.*, 286 U.S. at 119, 52 S.Ct. at 464. This test of "changed circumstances" resulting in "grievous wrong" has been consistently recognized and applied by both the First Circuit and this Court. See, e.g., *Coalition of Black Leadership v. Cianci*, 570 F.2d 12, 14 (1978); *Morris v. Travisono*, 499 F.Supp. 149, 156 (D.R.I.1980). Among the changed circumstances recognized by this Court as providing a meritorious reason for terminating a consent decree are new conditions, either factual or legal, that render continued enforcement unnecessary to effectuate the decree's original goals. *Id.*, 499 F.Supp. at 157.

2. *Application to the Lamphere Consent Decree*

■ In its prayer to terminate the Lamphere Consent Decree, defendant Brown University makes little effort to argue that continued compliance with the terms of the Decree is unduly onerous or, in the words of the *Swift* Court, would cause the University to suffer "hardship so extreme and unexpected as to justify us in saying that they are the victims of oppression." *Swift & Co.*, 286 U.S. at 119, 52 S.Ct. at 464. The essence of the University's limited hardship argument is succinctly summarized in the December 5, 1988 affidavit of Provost Maurice Glicksman, in which he asserts that it is unduly onerous for a university of Brown's statute to be the only institution in

and/or Modify the Lamphere Consent Decree.

its institutional peer group operating under the constraints of a judicial decree. While this Court is sympathetic to the University's discomfort with having to endure court supervision of affirmative action on its campus, the fact remains that the University consented to such oversight and has succeeded, while operating under the terms of the Decree, in making strides toward accomplishing the purposes of the order. To be required to continue to operate in the same manner that it has successfully operated in the past hardly amounts to the kind of extreme and unexpected hardship necessary to justify the termination of a consent decree. Although this Court finds no pleasure in its role as monitor in this case, this is of no consequence—the law as enunciated in *Swift* is clear and controlling.

Defendant's principal argument for terminating the Consent Decree is that, by complying with the goals and timetables established in Exhibit A, as "revised" in 1987 by the AAMC, it has complied fully with the Consent Decree as a whole, and thus the Decree should be terminated as no longer necessary to effectuate its goals. This attempt by the University to equate the broad purposes of the Consent Decree as a whole with the incremental objectives adopted in Exhibit A to guide appointments of women faculty to tenure, unjustifiably equates the ultimate goals of the Decree with its operational provisions. As the plain language of the Consent Decree makes clear:

> ... it is the objective [of the parties] by the entry of this Decree to correct previous injustices, if any, and to achieve on behalf of women full representativeness with respect to faculty employment at Brown University.

Consent Decree, Preamble. To accomplish this objective, the Decree defines with great precision specific, affirmative steps that the University must take, of which developing and maintaining goals and timetables in accordance with Exhibit A is but one. Indeed, even a cursory review of the Decree makes clear that it obligates the University to achieve not only the numerical objectives spelled out in Exhibit A, but also to take specific steps to apply affirmative action on behalf of women faculty in *every* phase of the employment process, from recruitment and hiring through contract renewal, promotion and tenure decisions until full utilization of women faculty based on statistical availability is reached. *See generally* Lamphere Consent Decree, Section 2(C)–(L).

Furthermore, as plainly stated in Exhibit A, achievement by the University of the objectives limned in the goals and timetables in no way substitutes for compliance with the Decree's overarching goal of achieving "full representativeness" of women on the University's faculty:

> The purpose of the Goals and Timetables herein described is to provide a measure of the extent to which the affirmative action procedures elaborated elsewhere are operating effectively.

Lamphere Consent Decree, Exhibit A, Section 2. At best, then, even exact attainment of the goals and timetables would serve as but one indication that the University is moving toward achieving the Decree's purposes of correcting previous injustices and attaining full representativeness of women on the faculty.

Accordingly, to assess whether "continued enforcement would still seem necessary to effectuate the goals of the decree", this Court must look to the University's accomplishment of the goals of the Consent Decree as a whole. *Morris v. Travisono,* 499 F.Supp. 149, 157 (D.R.I.1980). By this measure, Brown University cannot demonstrate that the broad purposes of the Lamphere Consent Decree have been achieved or even that all of the specific objectives established by the Decree as measures of goal attainment have been accomplished. Setting aside for the moment the somewhat complicated question of whether tenuring 50 women by 1987 satisfied the tenuring requirements of the original goals and timetables, the University has clearly fallen short on other indicia of "full representativeness" such as appointing women to tenured positions in each of the Departments or Divisions of the University. According to the University's EEO Officer, five Departments of the University (Computer Sci-

ence, East Asian Studies, Economics, Education and Music) had no tenured women faculty as of November 22, 1988. Although the Decree sets 1990 as the time by which the University is to accomplish the objective of tenuring women to all academic units of the institution, taking into account the size of the Department or Division and the appropriate availability pools, the fact remains that they have not accomplished this requirement despite their motion to terminate the Consent Decree. Consent Decree, Exhibit A, Section 9. By the logic of the Decree itself, such lapses in the University's compliance are fairly interpreted as evidence that the continued enforcement of the Decree is necessary in order to ensure that affirmative action is operating effectively at the University.

In sum, since the defendant has not shown that its continued compliance with the Decree causes it to suffer extreme and unexpected hardship, and since continued enforcement remains necessary to effectuate the broad goals of the Lamphere Consent Decree, I must deny defendant's motion to terminate the Decree in its entirety.

### 3. Goals and Timetables During Continuation of the Lamphere Consent Decree

The question remains, however, whether the University has at least fully accomplished the objectives established in Exhibit A of the Consent Decree and if so whether the Decree should be terminated at least as to Section 2(A)–(B) and Exhibit A, Sections 1–6a.

■ The University asserts, and plaintiffs agree, that it has exceeded by 40% the goals for appointing nontenured women to the faculty (Memorandum in Support of Brown University's Motion, December 1988 (hereafter "D. Memo. Dec. 1988"), p. 9) and that it has fully achieved the goals for appointing nontenured women on a disciplinary basis (Memorandum in Support of Brown University's Motion, July 1988 (hereafter "D. Memo. July 1988"), p. 2). In light of defendant's excellent record in this regard, this Court sees no reason to establish new goals and timetables for nonten-

ured women. Accordingly, the strictures of the Consent Decree are lifted as to the development and maintenance of goals and timetables for increasing the number of nontenured women on the University faculty. This order does not, however, terminate the Consent Decree as to the many protective mechanisms put in place to safeguard women faculty, both nontenured and tenured, in every phase of the employment process. To the extent that nontenured women at Brown University require continued recourse to the full array of affirmative action procedures outlined in the Decree, these mechanisms remain at their disposal.

■ The question of whether the University has fully achieved the goals set out in Exhibit A for tenured women is more difficult of solution, with defendant arguing that, by meeting the "revised goal" of 50 for 1987, it has fully complied with the goals and timetables, and plaintiffs responding that, by agreeing to a "revised goal" for 1987, the AAMC did not simultaneously agree on behalf of the plaintiff class to a redefinition of the key concept of "full utilization of women faculty based on statistical availability" and thus to a permanent downward revision of the overall goals for appointing women to the faculty. In plaintiffs' eyes, then, the "full utilization" goal for 1987 remains 57, as originally set in Exhibit A, and updated goals for future years should be calculated from this base.

Underlying the parties' disagreement over whether the goals and timetables have been met as to tenured women are differing views of how "full utilization in any given year" is to be determined, in particular how attrition of women from the faculty should be factored in to evaluating whether or not Brown has met its responsibilities under Exhibit A. According to Exhibit A, "full utilization in any given year" is a statistical projection of the number of women expected to be employed by the University in that year "as measured by the availability of men and women recipients of PhD degrees in the various disciplines and sub-disciplines represented by

departments or programs of the University." Consent Decree, Exhibit A, Section 4. This projection is made by determining, based on departmental staffing plans, the number of anticipated openings in each department or division of the University in the year in question, then multiplying the projected openings in each department or division by the percentage of women in the PhD availability pools for the relevant disciplines, and finally summing across all academic units. The resulting figure is the number of women, based on statistical availability, that the University should be expected to hire to ensure that women are represented on the faculty to the same degree that they are represented in the national pool of candidates qualified for academic appointments. Logically, then, the "full utilization" goal for any given year would be subject to revision only if there are changes in the statistics underlying the calculation of the goal, namely in the number of projected openings on the faculty or in the percentage of women in the relevant availability pools.

The genesis of the present impasse is the recent attempt by the University to amend the calculus outlined above. Specifically, as the 1987 deadline for tenuring women to the Brown faculty approached, the University sought to modify the formula employed to calculate the goals and timetables by factoring in the number of women lost to the University due to attrition, either through death, retirement or resignation. While it is true that Exhibit A, Section 6a of the Consent Decree indicates that the 1987 goal of 57 tenured women assumed no attrition of women from the tenured faculty (thereby implying that the goal should be revised if attrition were to become a significant factor in determining the number of women on the Brown faculty), the Decree provides no guidance as to how attrition should be factored in to recalculate the goal should the assumption of zero attrition prove false. Nevertheless, both the University and the AAMC claim to have taken attrition into account in some way in arriving at the "revised goal" of 50 for 1987.

Although this Court appreciates the distinction between tenuring and retaining women faculty, and thus understands that Brown University may succeed in appointing to tenure the number of women dictated by the terms of the Consent Decree only to lose some of them to attrition, the fact remains that only a carefully tailored approach to factoring attrition in to the "full utilization" calculus will prevent the gradual erosion of the proportion of tenured women on the Brown faculty due to attrition. More specifically, to allow the University annually to adjust the goals and timetables downward to reflect attrition will gradually diminish the base from which future expected increases in women faculty are calculated and act as a drag on the University's efforts to achieve "full representativeness with respect to faculty employment." Additionally, just as attrition might fairly need to be factored in to reduce the University's tenuring goals for a given year, so too the positions left open by attrition should also be added to the number of projected openings at the University, thus resulting in a countervailing increase in annual tenuring goals. In short, for this Court to accept a downward revision of the goals and timetables for 1987,[4] the manner in which the attrition variable is factored into the "full utilization" equation must be carefully calculated to preserve the Decree's overarching purpose of "full representativeness."

Having carefully reviewed the entire record in this case, including the testimony of University officials and an AAMC representative at the October 18, 1988 hearing on this matter, this Court cannot say exactly how attrition has been factored into the recalculation of the 1987 goals and timeta-

---

4. The University has attempted to argue that "the revision from 57 to 50 tenured women for 1987 has been implicitly recognized by an Order of this Court...." (D. Memo. July 1988 p. 2 n. 2.) In the July 14, 1987 Order to which defendant refers, this Court merely agreed not to hear a motion that had been brought in the matter. No consideration was ever given by this Court to the merits of the "revised goal" for 1987 and no order inserting the number 50 into the Consent Decree has ever been issued.

bles and thus cannot conclude that the method adopted was carefully tailored to preserve the ultimate intent of the Consent Decree. While it appears that the University and the AAMC agreed to revise the goal by deducting the number of women leaving employment from the total number of women tenured by the deadline, no explanation is given for this approach. (Testimony of M. Glicksman, Tr. 28–35; Testimony of H. Ward, Tr. 78.) It is also unclear on this record how or whether the effect of attrition on the number of projected openings at the University, and thus on the calculation of the goals and timetables, has been taken into account. Because this Court is powerless to modify the Consent Decree absent a showing of changed circumstances that make continued enforcement of the Decree as originally crafted oppressive, and because defendant has failed adequately to document its claim that 50 is a carefully tailored revision of the Decree's tenuring goal for 1987 necessarily made to avoid such oppression, this Court can only conclude that "full utilization" for 1987 remains at 57. Since the University has admittedly not achieved this goal, the Consent Decree is to remain in full force and effect as to tenured women faculty until at least June 30, 1991.[5]

Finally, taking 57 as the base figure for 1987, this Court further determines that the updated goal for 1991 will be 13 additional promotions or appointments to tenure, for a total goal for 1991 of 70 tenured women faculty.[6] Although the AAMC has made cogent arguments for adopting a goal for 1991 of an additional 15 tenured women,[7] this Court finds that the counterproposal of 13 advanced by the University[8] is the most realistic given this Court's insistence that 57 be retained as the base figure for 1987. Of course, as in the case of nontenured women faculty, tenured women faculty may continue to avail themselves of all the protective mechanisms outlined in the Lamphere Consent Decree.

## B. Burden of Proof

■ The defendant has also questioned the validity of the burden of proof mandated by the Decree for use in proceedings before the AAMC and the Court. The Decree requires that, when a candidate for a faculty position alleges that the University has discriminated on the basis of sex, the employer must prove by clear and convincing evidence that it did not discriminate on the basis of sex. Consent Decree, Section 2(F)(1)–(4). This "clear and convincing" standard is to be applied to judge the University's decisions in faculty recruitment, hiring, contract renewal, promotion and tenure as they affect women.

The defendant has proposed that the Court modify the burden of proof to conform to that typically used in Title VII cases. In an ordinary Title VII case, once the plaintiff makes out a prima facie case of discrimination, the employer must "articulate" a legitimate, nondiscriminatory rea-

5. This Court cannot adopt the June 30, 1990 termination date advocated by the University since neither party to these cross-motions has provided it with the data that it would need to establish updated goals and timetables for 1990. Instead both sides provided the Court with data relevant to calculating updated goals for 1991, and it is this data on which the Court now relies. If, however, the defendant is able to demonstrate compliance with the goals set herein before 1991, it can seek the appropriate modifications and/or termination of the Decree.

6. Because neither party has provided this Court with the information that it needs to establish sub-goals by areas of related academic disciplines, the Court has stopped at setting an overall goal for 1991. The AAMC is hereby ordered to convert the overall goal to proposed sub-goals by academic areas (i.e., Humanities, Social Sci-

ences, Physical Sciences and Life Sciences) by June 30, 1989, and to inform the Court of these sub-goals and the precise method of their calculation.

7. See generally Revision and Updating of Goals and Timetables for Tenured Women Faculty for 1991, appended to plaintiffs' Motion to Modify Consent Decree.

8. See generally Affidavit of Maurice Glicksman, December 5, 1988, appended to D. Memo Dec. 1988. In reaching this conclusion, the Court is mindful of the fact that Brown University now possesses a rich pool of nontenured women faculty, richer in qualified women than the national availability pools on which the goals and timetables are based, from which it can draw in meeting the updated goal of 70.

son for its actions. If the employer does so, the plaintiff must then show, by a preponderance of the evidence, that the asserted reason is a mere pretext for unlawful behavior. See, e.g., *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 252–53, 101 S.Ct. 1089, 1093–94, 67 L.Ed.2d 207 (1981). The burden of persuasion remains on the plaintiff throughout. *See id.* at 254–56, 101 S.Ct. at 1094–95.

The defendant states that, prior to *Burdine* and *Board of Trustees of Keene State College v. Sweeney*, 439 U.S. 24, 99 S.Ct. 295, 58 L.Ed.2d 216 (1978), it was thought that an employer was required to prove that the articulated non-discriminatory reason for rejecting the female applicant (the Title VII plaintiff) was in fact the true reason. Thus, when these parties filed the Consent Decree and when the Court entered that Decree in March 1978, the United States Supreme Court had not clarified, as it did in *Burdine* and *Sweeney*, that an employer's burden of proof was merely to articulate a non-discriminatory reason for its action and that the burden of persuasion always remained with the plaintiff (D. Memo. Dec. 1988, p. 11). This chronology of events is generally correct. The decisional law has been clarified since the entry of the Decree, so that the burden on an employer in an ordinary Title VII case is less than that set by the Decree as the burden of proof to which the University is held.

The burden of proof set by the Consent Decree was not *directly* based on a specific statute or prior judgment that was subsequently reversed, vacated or reconstrued, a circumstance which would allow a court to modify a consent decree to conform it to the change in the law. *Theriault v. Smith*, 523 F.2d 601 (1st Cir.1975). Instead the burden of proof was based *generally* on the state of the law before the Supreme Court had clarified the Title VII standard in *Sweeney* and *Burdine.* Thus the Decree must be evaluated according to the eq-

uitable principles of the *Swift* test: Has the party proposing the modification made "a clear showing of grievous wrong evoked by new and unforeseen conditions"? Defendant has not made this showing.

To support its position, defendant has put forth three reasons why the Court should modify the burden of proof:

(1) the achievement of the goals and timetables by the University,

(2) the clarification by the Supreme Court in *Burdine* and *Sweeney* of the Title VII burden of proof, and

(3) the pronounced difficulty experienced by some members of the AAMC in dealing with the University's proof of a negative, i.e., that it did not discriminate.

The first reason is irrelevant to the burden of proof issue. The University's success in meeting stated goals has no effect on the methods by which the parties are to respectively present and defend against a charge that a certain decision was tainted by sex discrimination.

As to the second reason, the fact that the law has changed could perhaps be characterized as a "new and unforeseen condition" permitting modification of the Decree if resulting in "grievous wrong". *See Morris v. Travisono*, 499 F.Supp. 149, 153–57 (D.R.I.1980) (a change in the state of the law may justify vacating a consent decree if continued enforcement of the decree works an injustice or constitutes a grievous wrong). However, the University has failed to allege any "grievous wrong" resulting from the "new condition". The fact that the law of Title VII now imposes a lesser burden on the employer than does the Consent Decree does not itself mandate a modification. In *Lamphere v. Brown, Appeal of Ann W. Seidman*, 798 F.2d 532, (1986) the First Circuit considered the validity of the Lamphere Consent Decree's burden of proof rules after *Sweeney* and *Burdine.*[9] The Circuit Court found guidance in

---

**9.** The First Circuit stated that no party to the case before it argued that the burden-of-proof rules plainly exceeded the bounds of reasonable sex-conscious relief. It is not clear whether the issue of the validity of the Consent Decree's

burden of proof was litigated in the Court of Appeals. If it was, then defendant University may be collaterally estopped from raising the issue here. In any event, this Court and the

Supreme Court precedent: "The Supreme Court has recently held that the particular provision of Title VII that limits a court's power to 'order' relief does not affect the validity of a consent decree. See *Local Number 93, Int'l Ass'n of Firefighters v. City of Cleveland,* 478 U.S. 501, 106 S.Ct. 3063, 92 L.Ed.2d 405 (1986) (construing Civil Rights Act of 1964, Title VII, Section 706(g))." The First Circuit found that the burden of proof rules set out in the Consent Decree "do not plainly exceed the bounds of 'reasonable [sex]-conscious relief' (citation omitted)", and concluded that it was proper to apply the Decree's rules in considering the claim before it. This Court agrees with the First Circuit's analysis of this issue and adopts its reasoning here.

The University's third rationale is that there is "confusion on the burden of proof by the AAMC." (D. Memo. July 1988, pp. 7–8, n. 4). In support of this allegation, the University states that: "On January 23, 1980 [while reviewing the discrimination claim of Ann Seidman], the AAMC noted that the University under its burden of proof was required to prove a negative by clear and convincing evidence, a requirement the AAMC termed a 'logical impossibility.'" (D. Memo. July 1988, p. 7, n. 4.) Defendant, however, has related only half the story; the rest is told by the First Circuit in its opinion on the claim of Ann Seidman:

> Concerned that a literal interpretation of the decree would impose on Brown the near-impossible task of "proving a negative" (that it did not discriminate based on sex), the Monitoring Committee rephrased the decree's substantive standard as follows:
>
> "the University must show that [its] action can be plausibly explained without reference to considerations of sex, and it must provide clear and convincing evidence that such an explanation is the correct one."
>
> That is to say, the decree requires Brown 1) to articulate a legitimate, nondiscriminatory reason for its actions, and 2) to show by clear and convincing evidence

that this reason is not a pretext. The parties basically agree that this interpretation is reasonable, and so do we.

*Appeal of Ann W. Seidman,* 798 F.2d at 536 (1986). Defendant has produced no recent evidence indicating that the AAMC is finding the burden of proof difficult to apply, nor do the AAMC's own reports suggest that the AAMC is having problems functioning with this burden of proof.

I realize that the Decree established a high standard for the University to meet, higher than that typically imposed in Title VII actions. However, this higher standard is the one on which the parties agreed, and I cannot modify it absent evidence that the use of this standard is now causing grievous wrong.

### C. *Scope of Judicial Review*

■ Defendant has asked the Court to recognize formally that the Consent Decree contemplates that an appeal of a decision by the AAMC will be given a completely new hearing by this Court. The issue of the scope of review was resolved by the First Circuit in *Appeal of Ann W. Seidman.* The Circuit Court said: "[The district court] believed the decree required a full judicial trial. And, we conclude that the court was correct." *Id.,* 798 F.2d at 537. The parties, therefore, can expect that any appeal of an AAMC decision to this Court will receive a full judicial trial.

### D. *Composition of the Affirmative Action Monitoring Committee*

Defendant has asked that the Court modify the selection of members for the AAMC in two ways.

■ First, it asks that "the two AAMC members currently selected by the Plaintiff Lamphere should be elected by secret ballot of the tenured and non-tenured women faculty." At the October 18 hearing, counsel for both parties agreed to this modification, and the Court stated that the Decree could be so modified. (Tr. 87–88). However, plaintiffs, in their brief in opposition

First Circuit are in agreement that the burden of    proof rules are valid.

to defendant's motion, object to the modification:

> A re-reading of Section (L) of the Decree provides that after the selection of the first (nominating) panel by Plaintiff Louise Lamphere, that nominating panel and its successors shall select ... successors. This has been the process and continues. Louise Lamphere has not nominated any panel other than the first one in 1977. Thus, there would be no need for modification.

Plaintiffs' Brief in Opposition to Defendant's Motion to Terminate or Modify Consent Decree, p. 2. Indeed, Section 2(L) provided that the plaintiff was to select two members of the original AAMC who would serve for a term of three years and was also to nominate a panel of three tenured faculty persons. This panel was to select two replacements for the AAMC and was to elect its own successors. If the process has in fact been operating in this manner, there is no need to modify the Decree in this regard.

■ Second, defendant asks that the University be allowed to select the fifth member of the AAMC. Currently that member is chosen by the four other AAMC members—two of whom are chosen by the panel, described above, and two elected by the voting faculty of the University. The University states: "While such a step would continue the AAMC as a faculty-based body, it would insure, we submit, a more representative committee to reflect matters of common interest to the faculty and the Administration and insure that there will be a balanced representation of disciplines on the Committee if the election process does not achieve such balance." (D. Memo. Dec. 1988, p. 14). This vague statement of the anticipated benefits from such a modification does not provide even an inkling that the current selection process is working an injustice to the University, much less that the AAMC is an instrument of "grievous wrong" according to the *Swift* test. Instead it merely provides an alternative but significantly different method for composing the Committee. The Consent Decree simply does not provide for selection of a Committee member by the University and defendant has presented no evidence to support modifying the composition of the AAMC in this way.

## III. CONCLUSION

To summarize, this Court holds that the Lamphere Consent Decree is to continue in full force and effect as to tenured women faculty and is to continue but for the establishment of updated goals and timetables for nontenured women faculty; that the new goal for tenured women faculty, to be achieved by June 30, 1991, is 70; that the AAMC will convert this overall goal to proposed sub-goals by academic areas by June 30, 1989, and will by that date inform the Court of these sub-goals and the precise method of their calculation; that the burden of proof to be applied by the AAMC and the courts will continue to be that originally established in the Decree, that is that the University must show by clear and convincing evidence that decisions made regarding faculty employment are non-discriminatory as to sex;[10] and that the method of electing members to the AAMC will remain as originally set forth in the Decree. In addition, this Court restates the First Circuit's holding in *Appeal of Ann W. Seidman*, 798 F.2d at 537, that any appeal of an AAMC decision to the courts shall be given a full judicial trial.

In arriving at these holdings, this Court wishes to assure the parties that it is sensitive to the difficulties created by direct court supervision of the internal affairs of academic institutions. As much as the Court might wish to withdraw from this role in the case at bar, however, the fact remains that this great nation has laws that must be obeyed and no court can alter or terminate a consent decree absent the necessary showing of changed circumstances. It is instead this Court's fervent hope

---

**10.** In *Appeal of Ann W. Seidman,* 798 F.2d at 536, the First Circuit approved the AAMC's rephrasing of the Decree's burden of proof, an interpretation which the parties basically agreed was reasonable at that time. The AAMC may continue to use this interpretation in carrying out its duties.

that, by June 30, 1991, the parties will have succeeded not only in achieving the goal of full utilization of women faculty, but also in implementing an internal affirmative action plan whose existence will enable this Court to reconsider the need for the Lamphere Consent Decree. Until such time, I am, despite my sympathies, powerless to ignore clear legal precedent and set aside this Decree.