Louise LAMPHERE, on behalf of herself and all others similarly situated

v.

BROWN UNIVERSITY IN PROVIDENCE in the State of Rhode Island and Providence Plantations, et al.

Civ. A. No. 75–0140 P.

United States District Court, D. Rhode Island.

May 12, 1989.

Milton Stanzler, Providence, R.I., for plaintiffs.

Peter McGinn, Tillinghast, Collins & Graham, and Beverly Ledbetter, Brown University, Providence, R.I., for defendant.

## OPINION AND ORDER

PETTINE, Senior District Judge.

On February 9, 1989, this Court issued an Opinion and Order in the above-captioned case, in response to cross-motions of the parties requesting modification and/or termination of a Consent Decree entered in 1977, holding that:

1. the Lamphere Consent Decree is to continue in full force and effect as to tenured women faculty and is to continue but for the establishment of updated goals and timetables for nontenured women faculty;

2. the new goal for tenured women faculty, to be achieved by June 30, 1991, is 70;

3. the AAMC will convert this overall goal to proposed sub-goals by academic areas by June 30, 1989, and will by that date inform the Court of these sub-goals and the precise method of their calculation;

4. the burden of proof to be applied by the AAMC and the courts will continue to be that originally established in the Decree, that is that the University must show by clear and convincing evidence that decisions made regarding faculty employment are non-discriminatory as to sex; and

5. the method of electing members to the AAMC will remain as originally set forth in the Decree.

In addition, the Court restated the First Circuit's holding in *Appeal of Ann W. Seidman*, 798 F.2d 532, 537 (1st Cir.1986), that any appeal of an AAMC decision to the courts shall be given a full judicial trial.[1]

The defendant, Brown University, has now moved for reconsideration of the February 1989 Opinion and Order on the grounds that the Court, in establishing the updated goal for 1991 for tenured women faculty, unnecessarily reviewed and inappropriately redetermined the 1987 goal from which the 1991 goal is derived, and that the Court adopted a standard for eval-

---

1. The February 1989 Opinion and Order is reported as *Lamphere v. Brown University*, 706 F.Supp. 131 (D.R.I.1989). Familiarity with this opinion is assumed.

uating whether to terminate the Consent Decree that is both unworkable and contrary to the intent of the parties, who set up specific standards in the Decree for measuring its continuing necessity. D. Motion 1–2. If the Court now decides to adopt defendant's views on these issue, it is argued, the logical consequences should be a determination that the University has substantially complied with the requirements of the Lamphere Consent Decree and thus a ruling that the Decree has terminated.

Having carefully reviewed both defendant's arguments and plaintiffs' objection, this Court again concludes that the Lamphere Consent Decree has not terminated because its ultimate objective of "full representativeness"[2] of women faculty has not yet been achieved. Because, however, the parties' continued wrangling over how to interpret and implement the Consent Decree stems from ambiguities in the Decree that have, with the passage of time, become so encrusted with competing meanings as to make unnecessarily difficult the Court's role as final arbiter of the Decree, this Court today resolves these ambiguities by definitively interpreting those terms that have become the focal point of the present impasse.

## I. BROWN UNIVERSITY'S MOTION FOR RECONSIDERATION

Defendant University raises two objections to the February 1989 opinion:

### A. Standard of Review for Terminating a Consent Decree

■ Defendant's complaint that the Court incorrectly adopted the "grievous wrong" standard of *United States v. Swift & Co.*, 286 U.S. 106, 52 S.Ct. 460, 76 L.Ed. 999 (1932) as the sole criterion for determining whether the Lamphere Consent Decree should be terminated is without merit. In the February 1989 Opinion and Order, this Court clearly applied the test of "substantial compliance" to the question of whether the Decree should be terminated

and found that, because the Decree's overarching goal of "full representativeness" had not been achieved, the Decree necessarily remained in effect. *Lamphere v. Brown University*, 706 F.Supp. 131, 138 (D.R.I.1989), citing *Morris v. Travisono*, 499 F.Supp. 149, 157 (D.R.I.1980). Since the Court agrees with defendant that a consent decree is to remain in effect so long as its continued enforcement is necessary to effectuate its purposes, and in fact applied this standard in the earlier opinion, I see no need to belabor this point further. *Id.* at 137 ("Among the changed circumstances recognized by this Court as providing a meritorious reason for terminating a consent decree are new conditions, either factual or legal, that render continued enforcement unnecessary to effectuate the decree's original goals.").

### B. Appropriateness of the Court's Redetermination of the 1987 Goal for Tenured Women Faculty

The University's second objection encompasses two arguments. First, defendant argues, the Court unnecessarily reviewed and rejected the updated goal for 1987 of 50 tenured women faculty set by the Affirmative Action Monitoring Committee (hereinafter "AAMC") in March 1987. Since plaintiffs failed to object to the updated goal of 50 at the time and in the manner spelled out in the Consent Decree, defendant reasons, this decision of the AAMC was no longer open for review in February 1989. Second, assuming that the updated goal for 1987 should remain at 50, the University's success in achieving this goal should have led the Court to conclude that the University had fully complied with the terms of the Decree by 1987 and thus that the Decree had terminated on its own terms.

This Court finds that the University's first argument, that the updated goal for 1987 of 50 tenured women faculty was not subject to review at the time of the February 1989 opinion, has merit. There is no

---

**2.** The Consent Decree clearly states "it is [the] objective [of the parties] by the entry of this Decree to correct previous injustices, if any, and to achieve on behalf of women full representativeness with respect to faculty employment at Brown University."

question that the Consent Decree charges the AAMC with its implementation and enforcement:

> There shall be established an Affirmative Action Monitoring Committee which shall be charged with the implementation of this Decree, the enforcement of this Decree, the hearing of any complaints as to violation of this Decree, and to act as a review body wherever described and required within the provisions of this Decree....
>
> The duties of the Committee shall be to oversee the general supervision and compliance by the Defendant of the various provisions and exhibits of this Consent Decree. In addition, the Committee shall make decisions where required and shall act as a review body where specifically required under the terms of this Decree.

Lamphere Consent Decree, Section 2(L). Among the Committee's explicit duties is the updating of the goals and timetables at issue here, a responsibility which it shares with this Court:

> In the event that the parties cannot agree upon updated goals and timetables ... updated goals and timetables will be determined by the Monitoring Committee, or the Court, in accordance with the principles established by this Exhibit.

Lamphere Consent Decree, Exhibit A (Goals and Timetables), paragraph 11. Further, the Decree provides that, whenever the AAMC makes a final decision on a matter upon which it is required to act by the Decree, the parties must seek review of that decision within 30 days:

> ... in the event that any woman is dissatisfied with a decision of the Committee which directly affects her, she may seek de novo consideration by appropriate motion to the Court. Likewise, de novo judicial consideration of Committee decisions with respect to implementation or compliance with the provisions of this Decree may be initiated by any class member. The University may also seek de novo consideration of any decision of the Committee by appropriate motion to the Court.... Motions with respect to final decisions of the Committee shall be filed no later than thirty (30) days from receipt of notice of the decision.

Lamphere Consent Decree, Section 2(L).

Against this backdrop, the history of the AAMC's decision to revise the 1987 goal of 57 downward to 50 reveals that the plaintiff class did indeed fail to seek de novo consideration of this decision. More specifically, in response to conflicting requests from the parties regarding the revision of the 1987 goal, the AAMC first revised the goal downward to 55 in October 1986. Memo from Affirmative Action Committee to L. Lamphere and J. Quinn, October 10, 1986. (Plaintiffs' Exhibit 4, Hearing of October 18, 1988.) On October 27, 1986, the University duly objected to this decision by filing with the Court a motion for de novo consideration. Plaintiffs countered with an objection to the motion, filed November 5, 1986. During the pendency of these motions, the AAMC again revised the 1987 goal, this time downward to 50, the figure originally requested by the University. Letter of March 16, 1987 from Karen Newman, Chair, AAMC. Several months then passed with no further action being taken on the cross-motions regarding the AAMC's first revision of the 1987 goal and no motions being filed objecting to the AAMC's second revision of the 1987 goal. Finally, on June 15, 1987, this Court wrote to the parties as follows:

> The motion for de novo consideration re revised goals and timetables had been pending since October 27, 1986. Can I just pass this matter or do we still have a viable controversy?

The attorney for the plaintiff class responded as follows on July 2, 1987:

> In light of the situation, I would suggest that this matter be passed as, at this point, I do not believe there is a viable controversy.

■ Taken as a whole, this history supports the University's view that the AAMC's decision of March 1987 to revise the 1987 goal for tenured women faculty downward to 50 was a final decision no longer subject to attack by the plaintiff class in subsequent proceedings. Although this Court clearly retains the power to re-

view this decision *sua sponte* when justice so requires, I am persuaded by the University's arguments that, given the history of this decision, to do so in the context of considering the parties' most recent cross-motions for modification or termination of the Consent Decree was indeed unnecessary and unfair. Accordingly, I conclude that the revised goal for 1987 should remain at 50.

▮ Having concluded this, however, this Court cannot further conclude that the University's achievement of this revised goal by 1987 constitutes substantial compliance with the purposes of the Lamphere Consent Decree, thereby mandating the Decree's termination. Instead, after again reviewing closely the entire Decree, I can only reiterate here what I stated clearly in the February opinion: the goals and timetables of Exhibit A are but "*a* measure of the extent to which the affirmative actions procedures elaborated elsewhere are operating effectively" (emphasis added) (Lamphere Consent Decree, Exhibit A, paragraph 2), and until "full utilization of women faculty based on statistical availability" (Lamphere Consent Decree, Section 2(B)), of which the goals and timetables are but benchmarks, is achieved, the Decree is to remain in full force and effect. Because, however, the parties' on-going disagreement over when and under what conditions the Lamphere Consent Decree will terminate stems from conflicting interpretations of critical terms of the Decree, this Court today determines to resolve these continuing sources of difficulty by interpreting these terms, explaining the relation between them and establishing explicit requirements for the Decree's termination, in order to guide the parties in their future efforts to implement the Decree.

## II. RESOLVING AMBIGUITIES IN THE LAMPHERE CONSENT DECREE

Two key concepts, both fundamental to an understanding of the Lamphere Consent Decree, are at issue: "full representativeness" and "full utilization."

The parties' stated objective in entering the Consent Decree was "to correct previous injustices, if any, and to achieve on behalf of women full representativeness with respect to faculty employment at Brown University." To achieve this overarching goal, affirmative action was to be applied "[u]ntil the goals as set forth in Exhibit A are attained and full utilization of women faculty based on statistical availability as defined in Exhibit A is reached." Exhibit A went on to establish interim goals for 1979, 1983 and 1987 that the University was to meet along the way to accomplishing the broad purposes of the Consent Decree.

The term "full representativeness" was not defined in the Consent Decree nor in the Exhibits thereto, and neither party has explicitly defined the concept or its relation to "full utilization." Exhibit A to the Consent Decree did define "full utilization" however:

> Full utilization in any given year should be the expected composition by sex of tenured and nontenured regular faculty positions in that year as measured by availability of men and women recipients of PhD degrees in the various disciplines and sub-disciplines represented by departments or programs at the University.

Lamphere Consent Decree, Exhibit A, paragraph 4.[3]

Over the years, the parties have seized on two markedly different interpretations of the term "full utilization," with different implications for the meaning of "full representativeness" and thus very divergent ramifications for the implementation of the Consent Decree.

### A. *The Plaintiffs' Interpretation*

The plaintiffs have always understood "full utilization of women faculty based on

---

**3.** The Decree refers to "tenured and nontenured regular faculty positions." However, the Court found, in its February Opinion, that the University had so far exceeded the goals for appointing women to nontenured faculty positions that it was not necessary to establish further goals for their hiring. This finding was not challenged, and I think that both parties would agree that the University has met its obligations with regard to nontenured faculty. Thus this discussion is restricted to the appointment of women to *tenured* positions.

statistical availability" to mean the number of women who would be faculty members if the University were to achieve today a faculty on which men and women were represented in proportion to their relative proportions in the appropriate pools of persons holding PhDs.[4] To calculate "full utilization" as thus defined, plaintiffs employ the following formula:

$$\frac{\text{\# of tenured positions at the University (by department)}}{\times \ \% \text{ of women in relevant availability pool (by discipline)}}$$

$$= \text{``full utilization'' (by department)}$$

Summing across all departments gives the figure for "full utilization of women faculty based on statistical availability" at the University, in plaintiffs' view.

### B. *The Defendant's Interpretation*

The defendant understands "full utilization" very differently. In defendant's view, "full utilization" does not mean the number of women that Brown would employ on its entire tenured faculty were it seeking to employ women in proportion to their current availability, but rather means the number of women that can be appointed to tenure by incrementally filling open positions with women in proportion to their availability in the relevant PhD pools. To calculate this version of "full utilization," defendant considers only the number of positions anticipated to be filled in an upcoming time period and determines how many of these positions should be filled by women, using the following formula:

$$\frac{\text{\# of anticipated tenure openings during the period (by department)}}{\times \ \% \text{ of women in the relevant availability pool (by discipline)}}$$

$$= \text{number of women to be tenured in the period (by department)}$$

Summing across all departments gives the total number of women to be tenured in the given period. Defendant then adds this number to the preceding goal set for tenured women, and deems this sum to be "full utilization" of women faculty for the given time period, subject to revision to account for faculty attrition.

### C. *The Relation Between "Full Representativeness" and "Full Utilization"*

■ Stepping back from these two conflicting definitions of "full utilization," this Court first determines that plaintiffs' definition is in fact an accurate interpretation of the concept of "full representativeness."

More specifically, "full representativeness" logically embodies the concept that women should be represented on the tenured Brown faculty in direct proportion to the percentage of women in the relevant availability pools.[5] Clearly, then, calculating the degree of "representativeness" of women on the Brown faculty involves determining how many positions of the total number comprising the Brown faculty should, based on statistical availability, be held by women. This is, of course, exactly how plaintiffs calculate "full utilization of women faculty based on statistical availability," discussed above. In short, viewing plaintiffs' formula for computing "full

---

**4.** The relevant availability pools consist of persons with PhDs nationwide whose degrees are in fields that qualify them for appointment in a given academic discipline. Although the availability pools have become richer in women over time, the Decree establishes that the relevant time period for calculating indices of availability for tenured positions runs from thirty-seven years prior to the goal year (assuming that the model age for earning a PhD is 28 and the age of retirement is 65) to six years prior to the goal year. *See* Exhibit A1, paragraph III.B.

**5.** The AAMC variously refers to this same principle as "full availability for tenured women faculty" (*see, e.g.,* "Revision and Updating of Goals and Timetables for Tenured Women Faculty for 1991," Report of the AAMC, appended to January 21, 1988 letter from Karen Newman, Chair, to this Court) or "the ultimate goal of full utilization" (*see, e.g.,* March 16, 1987 letter from Karen Newman, Chair, to this Court).

utilization" in the context of the Decree as a whole leads this Court to conclude that plaintiffs' approach to computing "full utilization" is, in fact, the operationalization of the Decree's overarching goal of "full representativeness."

In contrast, defendant's approach to the calculation of "full utilization" is, this Court today finds, the correct method to employ in setting interim goals in accordance with the requirements of Exhibit A, which goals are to serve as but a measure of the University's incremental progress toward implementing the broad affirmative action purposes of the Decree and achieving "full representativeness." Clearly, the defendant's definition of "full utilization" is narrower than plaintiffs' in its focus; it looks only toward achieving "representativeness" in the current appointments to tenure, but fails to look beyond that to what "full representativeness" of women on the faculty as a whole requires. In addition, the University takes the further step of interpreting the Decree to mean that, if the University succeeds in meeting each of the specific, numerical goals for tenured women set forth in Exhibit A, Section 6a for 1979, 1983 and 1987, that it has somehow accomplished substantial compliance with the broad purpose of the Decree. By this interpretation, however, defendant misapprehends the import of the interim goals: the interim goals are not ends in themselves, but rather are benchmarks along the way to the broader goal of "full utilization of women based on statistical availability" or, as I explained above, "full representativeness." [6] As the Decree clearly states, the interim goals were set to provide "a measure of the extent to which the affirmative action procedures ... are operating effectively." Consent Decree, Exhibit A, paragraph 2. But these procedures were, in turn, aimed at "achieving and maintaining a situation where the proportion of women in tenured ... positions on the Brown faculty reflects the proportion of women in the appropriate pool of available PhDs," which this Court has explained above is "full representativeness." Consent Decree, Exhibit A, paragraph 3. This Court simply cannot read into the Decree, as defendant has tried to do, an equation between the interim tenuring goals of Exhibit A, Section 6a and the Decree's larger purpose.

In sum, from this day forward, the Decree's goal of "full representativeness" shall be equated with the concept of "full utilization" employed by plaintiffs and shall be referred to as the "full representativeness goal," while "interim goals" shall be calculated according to the defendant's formula and shall be so designated. Specifically, these two concepts are to be operationalized as follows:

Full representativeness is to be calculated thusly:

$$\frac{\text{\# of tenured positions at the University (by department)}}{\times \text{ \% of women in the relevant availability pool (by discipline)}}$$

$$= \text{"full representativeness of women on the faculty" (by department)}$$

Summing across all departments gives the figure for "full representativeness" of women on the Brown faculty.

The interim goal for a given year is to be calculated thusly:

$$\frac{\text{\# of anticipated tenure openings during the period (by department)}}{\times \text{ \% of women in the relevant availability pool (by discipline)}}$$

$$= \text{number of women to be tenured in the period (by department)}$$

6. No less informed a body than the AAMC itself also understands the 1979, 1983 and 1987 goals established in Exhibit A to be nothing more than interim goals en route to "full representativeness." In the words of Karen Newman, Chair, AAMC, "Reducing the 1987 goal from 57 to 50 in no way contributes to meeting the ultimate goal of full utilization." Letter of March 16, 1987 to the District Court.

Summing across all departments gives the total number of women to be tenured in the given period. Adding this number to the last interim goal produces the interim goal for the given year, subject to adjustment for attrition.[7] It goes without saying that the continuing vitality of the interim goals lies in their ability to ensure the University's continued progress toward achieving the overarching goal of the Lamphere Consent Decree.

## III. SUBSTANTIAL COMPLIANCE WITH THE REQUIREMENTS OF THE LAMPHERE CONSENT DECREE

■ Having established the definitions above, this Court further finds that substantial compliance with the requirements of the Lamphere Consent Decree necessitates that defendant substantially achieve the Decree's overarching goal of "full representativeness" through implementation of the affirmative action procedures mandated by the Decree. The Court's definition of "full representativeness" is, admittedly, an ideal, envisioning the day that the University has succeeded in employing women in proportion to their presence in current availability pools. Because such changes in the composition of the Brown faculty necessarily take place over time, the Court acknowledges that exact compliance with the goal of "full representativeness" may not be reached for years. However, exact compliance is not the legal test for the termination of a consent decree. Rather, such a decree terminates if there has been "substantial compliance" with its terms.

To evaluate compliance with the Lamphere Consent Decree under this standard, the requirements of the Decree must be considered as a whole. In other words, the Court must judge to what extent the University has satisfied the Decree's provisions by looking at the University's successful implementation of all of the affirmative action procedures elaborated in the Decree, as measured by such indicia as the number of departments or divisions which employ women faculty at the tenured level by 1990 (per Consent Decree, Exhibit A, paragraph 9) and the total number of women employed in these academic units. Assuming full compliance with the Decree's affirmative action procedures, elaborated in Sections 2(C), 2(D), 2(E), 2(F), 2(G), 2(H), 2(I), 2(J), 2(K) and 2(L), and in light of the fact that "full representativeness" is always a moving target given the Decree's updating requirements, the Court would accept 90% of the "full representativeness" goal as substantial compliance, and the signal for termination of the Decree.

Against this backdrop, the Court decrees, based on the most recent calculations of the AAMC presented to this Court,[8] that:

1. The "full representativeness" goal for 1991 is 74 tenured women, derived by using the availability pools for 1954 through 1985 as established in Exhibit A1, paragraph III.B.;

2. Defendant will be in "substantial compliance" with this goal if it has on its faculty at least 67 tenured women in 1991, derived as 90% of 74; and

3. The interim goal for 1991 is 63, derived by adding 13, the number of additional women to be tenured during the period from 1987 to 1991, as decided in the February Opinion, to the goal of 50 tenured women set for 1987.[9]

Also by September 15, 1989, the AAMC shall convert both the "full representativeness" and interim goals to sub-goals by

---

7. The University has represented, and plaintiffs have not denied, that the parties agreed to account for attrition by decreasing the goal by 0.7 for each unexpected departure of a tenured woman faculty member and by 0.3 for each unexpected departure less than the number predicted for tenured male faculty members. Although not memorialized in the Decree, the AAMC has adopted this formula, and this Court today orders that it be used to account for attrition in future calculations of interim goals only.

8. "Revision and Updating of Goals and Timetables for Tenured Women Faculty for 1991," Report of the AAMC, appended to January 21, 1988 letter from Karen Newman, Chair.

9. If an interim goal, adjusted for attrition, has not been met, the University must demonstrate that it has made good faith efforts throughout the period in question to attain the goal and that no discrimination has occurred, as provided in the Consent Decree, Exhibit A, paragraph 10.

academic areas, as defined in Exhibit A, Section 6a, and report these results to the Court. Of course the AAMC continues to bear the responsibility for revising and updating these goals as appropriate, based on updated staffing projections for tenured faculty, updated data concerning relevant PhD availability pools and updated data on actual rates of attrition. Lamphere Consent Decree, Exhibit A, Sections 7, 8 and 11.

Finally, if the Decree is not terminated in 1991 by virtue of the ultimate goal of 67 tenured women faculty having been met, the AAMC is to set "full representativeness" and interim goals annually, beginning with 1992.

So ordered.